UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION


| UNITED STATES OF AMERICA, | ) | CASE NO:  1:18-MJ-02010-KK |
|---|---|---|
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Albuquerque, New Mexico |
| | ) | |
| JENNIFER RAEL, | ) | Tuesday, June 19, 2018 |
| | ) | (10:32 a.m. to 11:07 a.m.) |
| Defendant. | ) | |


PRELIMINARY / DETENTION HEARING

BEFORE THE HONORABLE KIRTAN KHALSA,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:            JACK BURKHEAD, ESQ.
                          U.S. Attorney's Office
                          District of New Mexico
                          P.O. Box 607
                          Albuquerque, NM 87103

For Defendant:            MALLORY M. GAGAN, ESQ.
                          Office of the Federal Public Defender
                          First State Bank Building
                          111 Lomas Boulevard NW, Suite 501
                          Albuquerque, NM 87102

U.S. Probation/Pretrial: S. Day

Court Reporter:           Recorded; Liberty - Rio Grande

Clerk:                    E. Hernandez

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1                          <u>INDEX</u>

2   <u>GOVERNMENT'S WITNESS</u>     <u>DIRECT</u>    <u>CROSS</u>      <u>REDIRECT</u>  <u>RECROSS</u>

3   JORDAN SPAETH              **3**       **17**        **23**

4


5   <u>RULING RE PROBABLE CAUSE</u>   **24**

6

7   <u>ARGUMENT RE DETENTION</u>

8   BY MS. GAGAN                **25**

9   BY MR. BURKHEAD             **27**

10

11  <u>RULING RE DETENTION</u>         **29**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **Albuquerque, New Mexico; Tuesday, June 19, 2018; 10:32 a.m.**

2                        **(Call to Order)**

3              **THE COURT:**  United States of America versus Jennifer

4    Rael.

5              **MR. BURKHEAD:**  Jack Burkhead for the United States.

6              **MS. GAGAN:**  Morning, your Honor, Mallory Gagan, on

7    behalf of Jennifer Rael who is present.

8              **THE COURT:**  Good morning.  Morning, Ms. Rael.  And is

9    the Government ready to call its witness?

10             **MR. BURKHEAD:**  Yes, your Honor.  The United States

11   calls FBI Agent Jordan Spadth.

12             **MS. GAGAN:**  Morning, Agent.

13             **THE WITNESS:**  Morning.

14             **THE CLERK:**  Please raise your right hand.

15          **JORDAN SPADTH, GOVERNMENT'S WITNESS, SWORN**

16             **THE CLERK:**  Okay.  Please have a seat and state your

17   name and spell your last name for the record.

18             **THE WITNESS:**  Jordan Spadth, S-P-A-D-T-H.

19             **MR. BURKHEAD:**  Good morning, Agent Spadth.  May I

20   proceed, your Honor?

21             **THE COURT:**  You may.

22                       **DIRECT EXAMINATION**

23   **BY MR. BURKHEAD:**

24   Q    I introduced you -- I called you as an FBI Agent, is that

25   in fact your occupation?

1    A    Yes, sir, it is.

2    Q    How long have you been an Agent with the Federal Bureau of

3    Investigation?

4    A    Since January of 2018, this year.

5    Q    And where -- are you currently assigned to Albuquerque?

6    A    Yes, sir, I am.

7    Q    What are your duties?

8    A    I'm assigned to the violent criminal squad.  I'm working

9    in Hobbs Act and bank robberies, investigating -- interviewing

10   suspects and working crimes that -- violent crimes.

11   Q    All right.  I want to focus your attention if I could on

12   June the 11th of this year, 2018.  Did you become aware on that

13   date or at some point thereafter of a robbery at the Western

14   Commerce Bank?

15   A    Yes, sir, I did.

16   Q    And which -- where is the Western Commerce Bank, the one

17   that we're talking about now?

18   A    It's 1910 Wyoming Boulevard, at the corner of Northeastern

19   in the city of Albuquerque.

20   Q    District of New Mexico?

21   A    Yes, sir.

22   Q    And just to check this box, that bank, is it a federally

23   insured bank?

24   A    Yes, it is.

25   Q    FDIC?

1   A    Yes, sir.

2   Q    All right.  Focusing your attention in roughly the 3:00

3   hour, tell us what happened in the bank that day?

4   A    A -- tellers observed a U-Haul van parked in the parking

5   lot.  And subsequently after that a female described as mid-

6   30s, heavyset, brown-reddish hair, brown eyes approached the

7   teller and asked what she needed to open an account.  While she

8   looked at the rest of the tellers and looked around

9   suspiciously, that female was given a response.  She then left

10  the bank and a teller observed her enter the aforementioned U-

11  Haul van.  Approximately 20 minutes later --

12  Q    I'm going to hit pause here before you get to that --

13  A    Yes, sir.

14  Q    -- 20 minutes later.  Did you subsequently learn who that

15  person was that entered the bank?

16  A    Yes, sir.

17  Q    Okay.  Did you -- who was it?

18  A    Through surveillance videos and tips we received, we were

19  able to identify the female as Jennifer Lynn Rael.

20  Q    The defendant in this case?

21  A    Yes, sir, she is.

22  Q    Do you see her in the courtroom today?

23  A    I do.

24  Q    Would you point her out for me?

25  A    She's right here sitting next to her attorney with reddish

1    hair and a red jumpsuit.

2            **MR. BURKHEAD:**  And would the record, your Honor,

3    reflect that the witness has identified the defendant?

4            **THE COURT:**  Any objection?

5            **MS. GAGAN:**  No, your Honor.

6            **THE COURT:**  The record will reflect the positive

7    identification of the defendant.

8        **(Witness identified Defendant)**

9    **BY MR. BURKHEAD:**

10   Q    On Saturday, June 16th or maybe it was Sunday, June 17th,

11   did you or someone from the FBI and/or the Albuquerque Police

12   Department have an occasion to speak with the defendant?

13   A    Yes, sir.

14   Q    And during the course of that conversation, did she

15   acknowledge that it was, in fact, her that walked into the

16   Western Commerce Bank on June 11th?

17   A    Yes, sir, she did.

18   Q    Okay.  And did she indicate why she was walking into the

19   bank looking around suspiciously like you just described?

20   A    Yes, sir, she did.

21   Q    And what did she say about that?

22   A    What she said was that she was looking for a guard in

23   hopes that her accomplice could later rob the bank.

24   Q    Okay.  Let's talk about the accomplice then, who was that?

25   A    Richard Rivera.

1  Q    And when -- where was Mr. Rivera when the defendant

2  entered the Western Commerce Bank?

3  A    He stayed in the van, sir, in the parking lot.

4  Q    Okay.  Did Ms. Rael, the defendant, eventually leave the

5  bank?

6  A    She did.

7  Q    Okay.  She got into the U-Haul as you indicated?

8  A    Yes, sir.

9  Q    Mr. Rivera did what at that point?  Did he enter the bank

10  at some point?

11  A    Yeah, a few minutes later, then he went into the bank.

12  They parked in an adjoining parking lot.

13  Q    And what did he do when he went into the bank?

14  A    Mr. Rivera had his head down and approached first teller

15  telling her that he wanted to know what he needed to open an

16  account, similar statement as to what Ms. Rael said, then he

17  told her that he had a gun, not a note, to give her all the

18  money and he was looking over her shoulder making sure she

19  didn't put any dye pack or anything in the money.

20  Q    And when he indicated that he had a gun not a note did he

21  make any physical gestures in conjunction with that statement?

22  A    Yes, sir, he pointed to his side.

23  Q    Okay.  And you're pointing to kind of your waist area, is

24  that correct, sir?

25  A    Yes, sir.  She described it as pointing kind of down here.

1  Q    Okay.  And just for the record, you were pointing to kind

2  of belt area?

3  A    Yes, sir, a common area where firearms are concealed.

4  Q    Right.  Okay.  Was a firearm visible at that point to

5  anyone?

6  A    It was not reported so, no one.

7  Q    All right.  And so let's pause again, let's talk about

8  firearms for a little bit.  Getting back to the statement from

9  -- that the defendant gave you.  Did she talk about firearms at

10  all?

11  A    Yes sir, she did.

12  Q    What did she say about that?

13  A    She said that she had purchased a pistol recently.

14  Q    Well what date did she purchase the pistol?

15  A    She purchased it on June 7th.

16  Q    And did she say where she purchased it from?

17  A    She said it was a gun shop on Old Coors Road.

18  Q    Is that here in Albuquerque?

19  A    Yes, sir, it is.

20  Q    And did you -- just you or anyone from the FBI do any

21  follow-up investigation on that point?

22  A    Yes, sir, I did.

23  Q    What did you do?

24  A    I responded out there and spoke with a salesman at the

25  store and was able to provide their name -- her name,

Spadth - Direct / By Mr. Burkhead                    9

1    Ms. Rael's name and picture and he remembered selling her a

2    pistol.  They were able to pull up the paperwork from June 7th,

3    where she had applied for, been approved for, and purchased a

4    diamondback 9 mm pistol.

5    Q    Okay.  Let's clean up on something real quick if we could,

6    I'm going to bring at your attention to paragraph 11 of the

7    criminal complaint that was filed in this case yesterday?

8    A    Yes, sir.

9    Q    Okay.  And then paragraph 11 indicates that the pistol

10   that the defendant purchased was a 380 semi-automatic.  Can you

11   help me?  You just described it as a 9 mm that she purchased?

12   A    Yes, sir.

13   Q    Help us understand that discrepancy?

14   A    She did describe it as a 9 mm and she when said small

15   while I was writing the complaint, it was a common error, 9 mm

16   and 380 are similar cartridges.  It was a mistake on my part.

17   Q    Okay.  So the complaint says 380, what Ms. Rael actually

18   told you was 9 mm?

19   A    Yes, sir.

20   Q    Okay.  Did you or anyone in the FBI execute a search

21   warrant yesterday?

22   A    Yes, sir, we did.

23   Q    On what location?

24   A    406 Louisiana Boulevard, I believe that's Northeast,

25   Apartment A.

1   Q    And with respect to the gun that we're currently talking

2   about, was anything found?

3   A    Yes, sir, we located the gun box with the label and

4   markings on it saying it was a diamondback pistol purchased

5   from the gun store on Old Coors Road.

6   Q    9 mm?

7   A    Yes, sir.

8   Q    That address you just described, is it -- it's

9   significant, why?

10  A    That is Ms. Rael's address, the address stated she was

11  living at.

12  Q    So let's go back inside the bank now.  Mr. Rivera is in

13  the bank.  He says he has a gun not to a note, points to the

14  side that the tellers have described, what happens then?

15  A    He threatened so loud that another employee on the other

16  side heard him mention a gun that he was going to kill the

17  tellers if he did not get the money quickly.  He went from one

18  teller to the next saying similar things, they're bagging the

19  money, then to the third teller, grabbing all the money that

20  they had in the cash register and then walking out of the store

21  -- or the bank.

22  Q    Okay.  And how much money did he walk out with?

23  A    Approximately $6,000.

24  Q    And did anyone observe him as he left the bank?

25  A    Yes, sir.

Spadth - Direct / By Mr. Burkhead                    11

1   Q    Tell us about what he's observed?

2   A    One of the employees observed him walking down

3   Northeastern away from Wyoming to a parking lot that was

4   adjacent behind the bank parking lot and immediately following

5   that, the white U-Haul van similar in appearance to the first

6   one, left the parking lot.

7   Q    Okay.  And this may sound like a silly question now but it

8   should have more relevance five questions down the road.  The

9   U-Haul van had all the typical markings of a U-Haul van?

10  A    Yes, it did.

11  Q    It looked familiar with seeing them on the street all the

12  time?

13  A    Yes, sir, they described it as a shiny, new-looking U-Haul

14  van with all the markings on it.

15  Q    Did you or anyone in the FBI do any of the investigation

16  with respect to the U-Haul van?

17  A    Yes, sir.

18  Q    Tell us about that.

19  A    A rental agreement was obtained from U-Haul on the 8th, I

20  believe, of June for a U-Haul van between U-Haul and

21  Ms. Jennifer Rael for a GMC van for 24 hours.

22  Q    Okay.  Was it returned?

23  A    It was not.

24  Q    Okay.  All right.  We're -- briefly touch on now, June the

25  14th of this year, 2018, was there a robbery at a BBVA Bank

1  here in Albuquerque?

2  A    Yes, sir.

3  Q    Tell us about that.

4  A    I believe it's -- the Compass Bank was on -- at close to

5  closing time.  A, described as a Hispanic male in his 50s or

6  somewhere around there, entered the bank with a folder and

7  stood at the center aisle where you deposit checks, the little

8  island.  A teller asked him if he needed anything -- or a loan

9  person on the desk to the side, anyway -- he subsequently went

10 to the register and showed the teller the -- a gun that he had

11 inside the notebook and demanded money.  They provided money to

12 him and he left the bank.

13 Q    Okay.  Did Ms. Rael, during her interview, say anything

14 about that robbery?

15 A    Yes, sir, she did.

16 Q    And what did she say?

17 A    She said that she was inside the van at the time, parked

18 it upon the complex across the road.

19 Q    The U-Haul van?

20 A    Yes, sir.

21 Q    And in this time period is there also a robbery at a gas

22 station that's relevant to Ms. Rael?

23 A    Yes, there was.

24 Q    What date was that?

25 A    I believe she stated that was 10th at the Giant gas

1  station.

2  Q    So that would have actually been the day before the

3  Western Commerce robbery?

4  A    Correct.

5  Q    What happened on the 10th?

6  A    They parked in an adjoining parking lot.  Ms. Rael entered

7  the store to buy a drink and went back to the van sometime

8  later Mr. Rivera -- they parked back in the parking lot,

9  Mr. Rivera went into the store, robbed it, and they left.

10  Q    Okay.  Want to focus your attention now on the 16th of

11  June which I think was Saturday.  Is that right?

12  A    Sounds right.

13  Q    Was there a robbery at a Verizon cell phone store on that

14  day?

15  A    Yes, sir, in the city of Albuquerque.

16  Q    Okay.  Where -- roughly where in the city was that?

17  A    I'm not sure on that, that's in --

18  Q    That's okay.  Who committed the robbery?

19  A    Mr. Rivera.

20  Q    How do you know that?

21  A    It was reported to me by the Albuquerque Police

22  Department.

23  Q    Okay.  And when Mr. Rivera committed the robbery, was

24  there a police pursuit afterward?

25  A    Yes, sir, there was.

1   Q    And where did that police pursuit end?

2   A    At the Smith's gas -- or -- grocery store.

3   Q    And roughly where do you --

4   A    I believe it's on -- in the area of Coal Street.

5   Q    Coal and Yale, around there?

6   A    Coal and Yale, 320 Yale, I believe.

7   Q    And not too far from where we're sitting today and

8   standing today.  How did that police pursuit end?

9   A    During the pursuit, Mr. Rivera had actually reportedly

10  fired at the police officers, and -- fired a pistol out the

11  vehicle at the police officers.  They had to make the vehicle

12  crash and even when it stopped, Mr. Rivera exited on foot, fled

13  on foot.

14  Q    Okay.  You said he was firing outside of the vehicle.

15  What kind of vehicle was it?

16  A    It was a white GMC van.

17  Q    Was it a U-Haul van?

18  A    It belonged to U-Haul but at that point it had no logos on

19  it.

20  Q    And did you later learn why it had no logos on it?

21  A    Yes, sir, I did.

22  Q    And what did you learn?

23  A    Ms. Rael stated that her and Mr. Rivera peeled the logos

24  off.

25  Q    Okay.  Well that would have been some time after the

1    Western Commerce Bank robbery and what you've just described on

2    the 16th?

3    A    Yes, sir.

4    Q    Okay.  Mr. Rivera got out, fled, what happened next?

5    A    He reportedly reached for his waistband at which time the

6    police officers shot and killed him.

7    Q    Where was Ms. Rael during this series of events?

8    A    By her statement, she was located inside the van.

9    Q    Okay.  Was she subsequently located?

10   A    She was.

11   Q    And where was she located?

12   A    She was inside the van, and police encountered her there.

13   Q    Okay.  And that was -- at some point thereafter, that's

14   when she gave the statement that we've been referring to

15   several times during the course of this testimony?

16   A    Yes, sir.

17   Q    In that statement, did she indicate how she knew

18   Mr. Rivera?

19   A    Yes, sir, she did.

20   Q    And walk us through that.

21   A    Her ex-husband is incarcerated in Southern New Mexico

22   Correctional Facility.  She stated that he was -- she was

23   smuggling drugs into him, he was transported -- transferred at

24   which time he introduced her to a Bruce and she had also

25   brought drugs in for him at which time she was then introduced

1    to Mr. Rivera after that by the Bruce individual.

2    Q    Okay.  And roughly, when did all of that happen?

3    A    Mr. Rivera was released on April 11th.  It was towards the

4    end of April she was introduced to him.

5    Q    Okay.  So they knew each other a month or two, somewhere

6    in that time period?

7    A    Yes, sir.

8    Q    Okay.  And the gun that we've been talking about, you said

9    that Ms. Rivera said -- indicated to you and to the FBI that

10   she purchased the gun?

11   A    Yes, sir.

12   Q    Did she indicate why she purchased the gun?

13   A    She stated that Mr. Rivera had encouraged her to purchase

14   the gun.

15   Q    And has that gun been located?

16   A    I believe it's inside the vehicle that APD has in custody

17   and they're going to do a search on it this afternoon.

18   Q    And you say you believe it's in custody.  Did someone look

19   inside and see a gun --

20   A    Yes, sir.

21   Q    -- and that's what causes you to say that?

22   A    Yes, sir.

23   Q    And that'll be confirmed, I guess, today when that search

24   warrant is executed?

25   A    Absolutely.

Spadth - Cross / By Ms. Gagan                    17

1    Q    Okay.  All right.  One last question just moving way back

2    here.  When Ms. -- when the defendant walked into Western

3    Commerce Bank, she said she -- her purpose of doing that was to

4    look and see if there was a guard?

5    A    Yes, sir.

6    Q    Was there a guard in the bank that day?

7    A    There was not.

8    Q    Okay.  And did the defendant indicate to you whether or

9    not she gave Mr. Rivera that information before he entered?

10   A    She did, yes, sir.

11   Q    Okay.

12          MR. BURKHEAD:  I have no further questions, sir.

13   Thank you very much.

14          THE WITNESS:  Yes, sir.

15          THE COURT:  Ms. Gagan?

16                    CROSS EXAMINATION

17   BY MS. GAGAN:

18   Q    Good morning, sir.

19   A    Good morning.

20   Q    You testified that the notation in your criminal complaint

21   that the gun is a 380 semi-automatic but that was a mistake,

22   right?

23   A    Yes, sir -- or yes, ma'am.  I'm sorry.

24   Q    Did you notice any other mistakes in your criminal

25   complaint?

1   A    No, ma'am.

2   Q    Okay.  Now on June 11th, that's the robbery at the Western

3   Commerce Bank, correct?

4   A    Yes, ma'am.

5   Q    And the information that you received is that Ms. Rael

6   entered the bank before Mr. Rivera?

7   A    That's correct.

8   Q    When she left she was seen getting into a white U-Haul

9   van, is that right?

10  A    Yes, ma'am.

11  Q    As the driver or the passenger?

12  A    The passenger.

13  Q    And that van was parked where at that time?

14  A    In the bank's parking lot.

15  Q    And you testified also that when the -- when Mr. Rivera

16  left the bank -- well where did he come from when he entered

17  the bank?  Did anyone see how he -- where he came from?

18  A    Just the main doors is the first time someone taught him.

19  Q    So no one saw him in the van --

20  A    I know --

21  Q    -- before he came in?

22  A    No, ma'am.

23  Q    And he said that he had a gun, correct?

24  A    That's correct.

25  Q    And pointed to his waist?

1   A    Yes, ma'am.

2   Q    But no one saw a gun?

3   A    That's right.

4   Q    And then he -- when he left the bank, he went to a

5   different parking lot not the bank parking lot?

6   A    It's directly behind the bank parking lot.  Walking out

7   the main doors just walk through the bank parking lot.

8   Q    Okay.  And did they see him enter the U-Haul van Mark

9   A    They did not.

10  Q    Was there a woman with him when he was in the bank

11  threatening people about a gun -- Ms. Rael?

12  A    I don't know if there was a woman in there but Ms. Rael

13  was not in there at that time.

14  Q    Did the teller see who was driving the U-Haul van as it

15  left the parking lot?

16  A    They did not, because it turned away from the bank.

17  Q    Did they see Ms. Rael in the U-Haul van?

18  A    They did not.

19  Q    The -- did you ever do a line up with the bank witnesses

20  with Ms. Rael's photograph?

21  A    I did not.

22  Q    And for the U-Haul van you wrote in your criminal

23  complaint that you ran a check on the license plate for the van

24  that Ms. Rael -- or rented, correct?  You ran the license

25  plate?

Spadth - Cross / By Ms. Gagan                    20

1   A    I think another agent did.

2   Q    Okay.  Was that license plate seen on the van that was at

3   the Western Commerce Bank?

4   A    No, ma'am.  No one saw the tag.

5   Q    The Verizon -- so there was some additional information

6   presented this morning about a June 14th robbery at a Compass

7   Bank, is that right?

8   A    Yes, ma'am.

9   Q    Was Ms. Rael seen in the Compass Bank by any of the

10  tellers?

11  A    She was not.

12  Q    And did you say that Mr. Rivera actually showed the teller

13  a gun or was it a threat?

14  A    That time he did show them a gun.

15  Q    Okay.

16  A    It -- like I said, it was inside of a folder that he sat

17  down right in front of the teller so they could see it.

18  Q    At the Giant gas station robbery --

19  A    Yes, ma'am.

20  Q    -- was Ms. Rael in the gas station when Mr. Rivera robbed

21  it?

22  A    I do not believe so.

23  Q    Was there a mention of a gun?

24  A    Yes, ma'am.

25  Q    Did anyone see a gun?

Spadth - Cross / By Ms. Gagan                               21

1    A    Yes, he pulled it on the attendant.

2    Q    For the Verizon on June 16th, your criminal complaint, you

3    indicate that APD located suspects in a white van.  Where did

4    APD first spot the white van?

5    A    Ma'am, I can't testify to that.  I can testify as to what

6    Ms. Rael told me though.

7    Q    So you don't know when APD first spotted the van?

8    A    I do not.

9    Q    And then later identified as the stolen U-Haul van, how

10   was -- how was that van identified as stolen U-Haul van?

11   A    It's under investigation by APD.  I haven't had a chance

12   to speak with them about it, but I'd imagine the VIN number.

13   Q    So is that just information by -- from APD?

14   A    Yes, ma'am.

15   Q    But you don't know how it was identified?

16   A    No, ma'am.

17   Q    And you said that Mr. Rivera was firing a pistol out of

18   the vehicle at officers, is that right?

19   A    Yes.

20   Q    Was he the driver of the vehicle?

21   A    At some point they had switched, and I believe that is

22   when the police had noticed that the vehicle Ms. Rael testified

23   -- or stated that it was at a gas station they pulled over and

24   he then drove.

25   Q    So he was driving at the time that he was shooting?

Spadth - Cross / By Ms. Gagan                                    22

1   A    It's my understanding.

2   Q    Did anyone, any APD officers or witnesses, indicate that

3   Ms. Rael was shooting a gun at officers?

4   A    I have not heard that.

5   Q    And Mr. Rivera fled on foot after this crash, right?

6   A    Yes.

7   Q    Did -- is there any evidence that Ms. Rael fled on foot?

8   A    I do not believe so.

9   Q    And, in fact, officers located her inside of the van, is

10  that right?

11  A    That's my understanding, yes, ma'am.

12  Q    In -- on the passenger side in the passenger seat?

13  A    Yes, I believe so.

14  Q    And the -- there was a firearm eventually located in the

15  vehicle?

16  A    Yes.

17  Q    Like officers looking in or did they go in the vehicle?

18  A    My understanding is there was a magazine outside of the

19  vehicle on the ground and then a magazine inside the vehicle

20  and a firearm located in the vehicle in the floorboard as well.

21  But, like I said, no one has searched that vehicle yet, they

22  just looked in from the outside.

23  Q    And that's being done today?

24  A    Yes.

25  Q    Your conversation, your interrogation of Ms. Rael, was

1    that recorded?

2    A     It was.

3    Q     Audio and video?

4    A     Just audio.

5          **MS. GAGAN:**  If I could just have a moment, your

6    Honor?  I don't have any other questions.

7          **THE COURT:**  All right.  Any redirect?

8          **MR. BURKHEAD:**  Just briefly, your Honor.

9                        **REDIRECT EXAMINATION**

10   **BY MR. BURKHEAD:**

11   Q     Agent, you were asked about the Western Commerce robbery

12   and whether anyone saw the gun in the course of the robbery?

13   A     Yes, sir.

14   Q     Your answer was, "No."  Did the defendant know Mr. Rivera

15   had a gun during that robbery?

16   A     Yes, sir, she did.

17   Q     And how do you know that?

18   A     I asked her.

19   Q     And what did she say?

20   A     She said that he carried it in his pocket at all times and

21   he always had the gun when he went into the banks.

22   Q     Okay.  And -- to rob them?

23   A     Yes, sir.

24   Q     And did she know that he had the gun before he entered the

25   Western Commerce Bank?

1   A    Yes, sir.

2   Q    And how do you know that?

3   A    Because I asked her.

4        MR. BURKHEAD:  Thank you very much.  No further

5   questions.

6        THE WITNESS:  Yes, sir.

7        THE COURT:  All right, Ms. Gagan, is there anything

8   else?  May I let this witness step down?

9        MS. GAGAN:  Yes, your Honor, I have no other

10  questions.

11       MR. BURKHEAD:  No further questions.

12       THE COURT:  All right.  You're excused, Agent.  Thank

13  you.

14       THE WITNESS:  Thank you.

15       THE COURT:  Any other witnesses?

16       MR. BURKHEAD:  Not from the Government.

17       THE COURT:  Any witnesses, Ms. Gagan, or argument?

18       MS. GAGAN:  No, your Honor.

19       THE COURT:  All right.  Based on Agent Spadth's

20  testimony here, I find probable cause to support both of the

21  charges in the criminal complaint against Ms. Rael.

22       Okay, Ms. Rael, come up to the podium.  We're going

23  to take up the issue of detention now.  I found probable cause

24  to believe you committed the crime of -- crimes of bank

25  robbery, use of a firearm in commission of a violent crime, and

1  specifically aiding and abetting those crimes, in violation of

2  18 United States Code Section 2113, 924(c), and Section 2 and

3  the 924(c) count carries a presumption -- a rebuttable

4  presumption that you are a flight risk and a danger to the

5  community.

6      And so I'll recognize you, Ms. Gagan?

7      **MS. GAGAN:**  Thank you, your Honor.  We would request

8  that the court consider releasing Ms. Rael to the La Posada

9  Halfway House.  As the court can see from the Pretrial

10  Service's information, Ms. Rael -- although the allegations in

11  this case are quite serious and the court heard the officer's

12  testimony, she -- Ms. Rael has a very limited criminal history,

13  one dismissed domestic violence related charge, and then it

14  looks like she pled guilty in 2012 to driving without

15  insurance.

16      It's also documented that Ms. Rael has a history of

17  substance abuse and mental health issues.  I think that through

18  close supervision and monitoring at the halfway house, she can

19  certainly get both mental health and substance abuse

20  counseling.

21      She has cooperated in the past.  There's some

22  information in the Pretrial Service's Report about it and in

23  speaking with both Ms. Rael and her mother, Linda Bone, who is

24  present in the courtroom this morning, that Ms. Rael has worked

25  with CYFD in the past in order to regain custody of her

1    children.  And that at least for a period of time she was doing

2    the drug and alcohol counseling and maintaining her sobriety

3    such that CYFD agreed to return her youngest daughter home to

4    her.

5              So I think that although we don't have, you know, a

6    history of her complying and being successful with probation,

7    she is capable of doing what she is told when she is monitored

8    by the authorities, and I think that that could translate into

9    pretrial services supervision and she could certainly benefit

10   from counseling.

11             She's lived here in New Mexico for over 20 years.

12   Her entire family is here.  Her children are here.  Her mother

13   is here.  I don't think that she's a flight risk.  I don't

14   think she has the means with which to flee.  Her income is

15   limited to Social Security and food stamp money.  She would --

16   I think that the court could address any conditions about her

17   appearance in the future through pretrial services monitoring.

18             As far as the instant offense occurs or as far as the

19   instant offense, the testimony is not that Ms. Rael, you know,

20   possessed the firearm during the commission of these crimes.

21   It's not that she was actively involved in this shoot out with

22   APD, that it was Mr. Rivera who was seen as shooting at the

23   police, that he is the one who fled, and that Ms. Rael was

24   found still in the vehicle by officers.

25             So she didn't flee the scene and she certainly

1    (glitch in audio) evidence is not that she was an individual

2    who was shooting at law enforcement.

3           She also has some significant medical issues.  She's

4    on oxygen.  It's my understanding that she has her oxygen with

5    her but she's also supposed to be taking some medication for

6    her heart and antibiotics.  That's sort of what led to the

7    decrease in oxygen and the need for oxygen.  And she has

8    informed me that she has refill prescriptions at Presbyterian

9    but that she hasn't been able to get those medications at the

10   jail yet.  And I think last night when she arrived or yesterday

11   afternoon when she arrived at the Cibola County Facility after

12   court yesterday, she was taken to the hospital to be seen.  So

13   there are these ongoing medical concerns as well.

14          So we would ask that the court consider, you know,

15   close monitoring and supervision in the halfway house in this

16   case.

17          **THE COURT:**  Mr. Burkhead?

18          **MR. BURKHEAD:**  Thank you, your Honor.  I'll start off

19   by stating the obvious and well-known that we have a rebuttable

20   presumption case here based on the 924(c) charge.

21          When I got the pretrial services report, I'll

22   confess, I was expecting to see a longer criminal history just

23   based on these types of crimes and the type of people that

24   generally commit these crimes.  Ms. Rael didn't have that.  She

25   had one left on the radar the 2007, looks like it's probably a

1  misdemeanor battery case here in natural court that was, like a

2  lot of them, dismissed.  Maybe one FTA also associated with her

3  prior criminal history as well.

4         Whatever benefit she may have -- get from that

5  criminal history, I think, is outweighed significantly by the

6  eight-day crime spree that she went on last week.  During those

7  eight days, your Honor, she participated in some capacity or

8  another in four different armed robberies here in Albuquerque,

9  two banks, a cell phone store which is the -- now a new

10 favorite place for armed robbers to hit in New Mexico or at

11 least in Albuquerque, and a gas station.

12        Her role in this was not incidental.  She may have

13 been in the passenger seat, but she was an active participant

14 and the court knows that because before starting all the bad,

15 she rented a vehicle that was the getaway vehicle for all of

16 these robberies.  She bought the gun that was used and I

17 believe that will be found later today when we open up the van

18 in the robberies.

19        And in the charged offense, the charge offense being

20 the bank robbery, she just didn't simply sit in the vehicle.

21 She walked in with the purpose of making sure there was no

22 armed guard in there and then happened to get into the shoot

23 out yet later.  When she saw no armed guard in there, she

24 walked back out to the U-Haul, she reported that information to

25 her co-defendant who then went in and robbed the place.

1          Her role was not incidental at all.  Nothing I just

2    heard, in Government's view, outweighs the rebuttable

3    presumption that exists in the case.

4          And certainly the facts of the case are troubling

5    enough where the Government believes detention is more than

6    warranted.  We'd ask the court to do just that.  Thank you.

7          **THE COURT:**  Anything further you wish to add?

8          **MS. GAGAN:**  No, your Honor.  No.

9          **THE COURT:**  All right.  I find by clear and

10   convincing evidence that no condition or combination of

11   conditions of release will reasonably assure the safety of any

12   other person in the community, and by a preponderance of the

13   evidence that no condition or combination of conditions of

14   release will reasonably assure the defendant's appearance as

15   required.

16          And I make these findings after considering the

17   factors set forth in 18 United States Code Section 3142(g), the

18   rebuttable presumption in this case, the information presented

19   at the detention hearing, the information that I have in front

20   of me in the presentence report and, of course, the information

21   presented through the testimony of the agent here in court

22   today.

23          Ms. Rael, I am remanding you to the custody of the

24   Marshal's service pending your trial in this matter, and your

25   attorney has highlighted some medical concerns that you have.

30

1          She's also indicated that at least thus far that you

2    were taken to the hospital and so presumably your medical

3    condition is being followed.  But to the extent that any issues

4    come up or you have problems with your prescription medication,

5    I would encourage you to talk to your counsel about perhaps

6    doing a release of information so that prior prescription

7    orders can be provided to the Cibola County Facility.  And if

8    they can't provide those exact prescriptions, perhaps we can

9    provide an alternative.

10          But to the extent that any issues come up where you

11   believe that you're not receiving the medical care to which

12   you're constitutionally entitled, I'm sure your attorney will

13   provide that to me.  I'd certainly work with the Marshal

14   service.

15          And again, if any issues come up that aren't being

16   adequately addressed, feel free to raise them with the court.

17          **MS. GAGAN:**  Thank you, your Honor.  Can I have

18   Ms. Rael remain for just a moment to sign the court's HIPAA

19   compliant release that might assist me in helping her with that

20   right away?

21          **THE COURT:**  Yes.

22          **MR. BURKHEAD:**  May I be excused, your Honor?

23          **THE COURT:**  You may.

24     **(Proceeding adjourned at 11:07 a.m.)**

25

CERTIFICATION


I certify that the foregoing is a correct transcript from the

electronic sound recording of the proceedings in the above-

entitled matter.




_____          _August 28, 2018_


                TONI HUDSON, TRANSCRIBER